IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOCKHEED MARTIN CORPORATION<br>6801 Rockledge Drive<br>Bethesda, MD 20817<br><br>UNISYS CORPORATION<br>Unisys Way<br>Blue Bell, PA 19424<br>     Plaintiffs,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>     Defendant. | Civil Action No. |

**COMPLAINT FOR RECOVERY OF RESPONSE COSTS
AND DECLARATORY RELIEF**

  1. Lockheed Martin Corporation ("Lockheed Martin") and Unisys Corporation ("Unisys") (Lockheed Martin and Unisys will hereafter be referred to as "Plaintiffs") hereby complain against the United States of America ("the United States" or "the Government") to recover response costs pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9607.  These claims involve a military equipment manufacturing facility at 365 Lakeville Road in Great Neck, New York (the "Great Neck Manufacturing Facility"), at which hazardous substances, including, without limitation, trichloroethylene ("TCE") and tetrachloroethylene ("PCE"), have been detected in the soil and groundwater underneath and surrounding the facility.  Plaintiffs seek to recover certain remediation and cleanup costs, including, but not limited to, all costs incurred in the past and to be incurred in the future to clean up the groundwater and soil at and around the Great Neck Manufacturing Facility.

## **THE PARTIES**

2. Plaintiff Lockheed Martin is a Maryland corporation. Lockheed Martin is the corporate parent of Lockheed Martin Tactical Systems, a wholly owned subsidiary. Lockheed Martin Tactical Systems was formed in 1996 when LAC Acquisition Corporation merged with the Loral Corporation.

3. Plaintiff Unisys is a Delaware corporation. Unisys was formed in 1986 by the merger of Sperry Rand Corporation and Burroughs Corporation. Sperry Rand Corporation, in turn, was formed by the merger of Sperry Corporation and Remington Rand in 1955. The predecessor of Sperry Corporation, Sperry Gyroscope Company, was founded in 1910. In 1995, Loral Corporation purchased certain assets of Unisys, including the Great Neck Manufacturing Facility.

4. Defendant United States resides, may be found, and has its principal office in the District of Columbia. The Government conducts business through its various agencies, including the General Services Administration; the Departments of Defense, including the Army, the Air Force, the Navy, and their predecessors in interest; and through its former agencies, including the War Assets Administration, the Defense Plant Corporation, and the Reconstruction Finance Corporation.[1]

---

[1] The Reconstruction Finance Corporation was a Government corporation established by Congress in 1932. H.R. 7360, 72d Cong., 1st Sess., ch. 8, Pub. L. No. 2, 47 Stat. 5-12 (Jan. 22, 1932). The Reconstruction Finance Corporation established the Defense Plant Corporation as a subsidiary on August 23, 1940, pursuant to Section 5-d of the Reconstruction Finance Act. After World War II, pursuant to a joint resolution of Congress, the Reconstruction Finance Corporation succeeded to all functions, rights and assets of the Defense Plant Corporation, S. Con. Res. 65, 79th Cong., 2d Sess., ch. 215, Pub. L. No. 109 (June 30, 1945). The Reconstruction Finance Corporation continued to act by and through the General Services Administrator pursuant to the Surplus Property Act of 1944, H.R. 5125, 78th Cong., 2d Sess., ch. 479, Pub. L. No. 457, 58 Stat. 764, the Federal Property and Administrative Services Act of

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. §§ 1331.

6. Venue is proper in this judicial district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) and (e), because the defendant resides, may be found, or has its principal office within this district.

## GOVERNMENT OWNERSHIP AND CONTROL OF OPERATIONS AT THE GREAT NECK MANUFACTURING FACILITY

7. Prior to World War II, Sperry Gyroscope Company was a producer of maritime gyrocompasses. At the direction of Army Air Forces personnel, Sperry expanded its research and development activities and manufacturing to include bombsights, fire control systems and other necessary wartime equipment and materials.

8. In 1941, the United States War Department determined that "the substantial expansion of the existing capacity for the production of scientific equipment for navigation, communication and fire control, and other products required by the Government for its National Defense Program is essential," and, accordingly, "the establishment of an additional plant at or near North Hempstead, Long Island, New York for operation by Sperry Gyroscope Company, Inc. (hereinafter called 'Sperry') and the acquisition of machinery and equipment for use by Sperry in said plant are required." The War Department agreed to reimburse the Defense Plant Corporation for acquisition of property and construction of the new plant.

---

1949, H.R. 4754, 81st Cong., 1st Sess. ch. 288, Pub. L. No. 152, 63 Stat. 377, and regulations and orders promulgated thereunder.

9. After a wide-ranging search for a suitable plant location, the United States Defense Plant Corporation identified approximately 130 acres of undeveloped land owned primarily by individual landowners around Lake Success, New York as the best available site for a new aeronautical equipment plant. The individual landowners sold or donated their parcels of land to the Government to allow the war production plant to be built.

10. In July of 1941, the Defense Plant Corporation entered into a contract and lease with Sperry Gyroscope Company under which Sperry, acting expressly as an agent for the Defense Plant Corporation, hired Stone Weber Guy, Inc. to construct the Great Neck Manufacturing Facility on the Lake Success property. Under the contract between Sperry Gyroscope Company and the Defense Plant Corporation, the United States reviewed and approved all construction and equipment plans for the Great Neck Manufacturing Facility. Construction on the Great Neck Manufacturing Facility was completed at a cost of almost $40,000,000, and the facility began war production in February of 1942.

11. The Great Neck Manufacturing Facility lease between Sperry and the Government prohibited Sperry from performing any non-governmental work at the facility without prior approval from the Government. That lease also provided that all of the equipment used at the Great Neck Manufacturing Facility was Government owned.

12. During World War II, the Government controlled every aspect of the Great Neck Manufacturing Facility's day-to-day operations, including the following:

   a) The Government determined the products, rate of production and delivery of military equipment from Sperry;

    b)    The Government required Sperry to use particular subcontractors to facilitate production;

    c)    The Government controlled the price and supply of raw materials, including solvents such as TCE and PCE, used at the Great Neck Manufacturing Facility;

    d)    The Government controlled the price Sperry would be paid for its finished products by, among other things, requiring Sperry to renegotiate its supply contracts with third parties under the Renegotiation Act, P.L. 77-528, § 403, 56 Stat. 245 (April 28, 1942), and other price control legislation;

    e)    The Government controlled Sperry's labor force by, among other things, controlling employee hours and pay rates at the Sperry facility, handling personnel issues at the Sperry facility, and obtaining draft deferrals for certain key Sperry employees.

13.    More than 100 military personnel were stationed at the Great Neck Manufacturing Facility throughout most of World War II. These military personnel took over many of the traditional functions of management including, without limitation, controlling the source of raw materials; expediting materials to Sperry; inspecting and testing raw materials, manufacturing processes and completed equipment; and providing security for the facility.

14.    In October of 1950, Sperry Corporation, the successor to the Sperry Gyroscope Company, purchased the Great Neck Manufacturing Facility from the Reconstruction Finance Corporation, the successor to the Defense Plant Corporation.

15.     The Government required the sale of the Great Neck Manufacturing Facility to be subject to a National Security Clause, which was affixed to the deed for the property pursuant to the National Industrial Reserve Act of 1948, Pub. L. No. 80-883, 62 Stat. 1225 (1948).  That National Security Clause expressly reserved to the Government an ownership interest in the Great Neck Manufacturing Facility for a period of twenty years.  The Government maintained this ownership interest in the Great Neck Manufacturing Facility from October of 1950 until December 2, 1970.

16.     At various times between 1950 and 1970, the Government exercised its property rights under the National Security Clause.  The Government refused to allow Sperry to install a new sewer connector to the Great Neck Manufacturing Facility until Sperry paid the Government to release the clause.  The Government also refused to allow Sperry to sell an unused, outdated building on the site without prior government approval.

17.     After Sperry purchased the plant in 1950, the vast majority of the work at the Great Neck Manufacturing Facility continued to be performed under Government contracts.

18.     The Government assigned permanent resident military representatives to the Great Neck Manufacturing Facility to oversee each contract.  After World War II, the number of resident military representatives located at the Great Neck Manufacturing Facility varied.

19.     The Government controlled which customers could purchase equipment produced at the Great Neck facility after World War II by, among other things, preventing Sperry from exporting equipment it manufactured.

20. Pursuant to federal procurement regulations and procurement contracts with the Government, all equipment, parts, tooling, supplies, and other materials acquired or manufactured at the Great Neck Manufacturing Facility in connection with a contract, the cost of which was chargeable to the contract, became the property of the Government. Under these regulations and contracts, the Government owned the raw materials, including solvents such as TCE and PCE, used to manufacture aeronautical equipment. The Government also owned all scrap material generated from any government furnished material.

21. Upon completion of a production contract, personnel at the Great Neck Manufacturing Facility were required to obtain the Government's approval for the disposition of all Government property, return it to the Government, or use the property on another Government contract. All proceeds for the sale of surplus Government property were paid to the Government.

22. Government contracts required the use of Government-owned or Government-specified materials in connection with the production of aeronautical equipment at the Great Neck Manufacturing Facility.

23. During the entire period of operations at the Great Neck Manufacturing Facility, the Government promulgated technical, operational and material specifications for manufacturing processes and materials. Compliance with military specifications was mandatory for every contract with the Government. In order to deviate from a military specification, formal written approval was required from the Government. Internal process standards and reliability standards at the Great Neck Manufacturing Facility were based on military specifications.

24. Many of the military specifications governing production at the Great Neck Manufacturing Facility required the use of TCE and PCE in the manufacturing process.

25. TCE or PCE was used in vapor degreasing operations and in other manufacturing processes from 1942 through 1979. After 1969, the use of TCE was largely replaced by PCE. Manufacturing activities at the Great Neck Manufacturing Facility slowed significantly in the 1970s and 1980s.

## PLAINTIFFS' RESPONSE TO THE RELEASE OF HAZARDOUS SUBSTANCES FROM THE GREAT NECK MANUFACTURING FACILITY

26. The "Great Neck Site" is the area of soil and groundwater contamination, including, without limitation, TCE, PCE, and/or other volatile organic compounds, presently located at, under or around the Great Neck Manufacturing Facility in Nassau County, New York, and includes any areas to which such groundwater and soil contamination may migrate.

27. Hazardous substances, including, without limitation, TCE, PCE, and/or other volatile organic compounds, were released in the course of operations at the Great Neck Manufacturing Facility. As the result of these releases, hazardous substances, including, without limitation, TCE, PCE and other volatile organic compounds, have come to be located in the groundwater and real property at the Great Neck Site.

28. In 1978, solvent contamination was discovered outside the southeast corner of the manufacturing building in the area where a dry well was located. The dry well was part of the original design and construction of the facility in 1941 and 1942, and was connected to floor

8

drains throughout the manufacturing building. In response to this discovery, working with the Nassau County Department of Health, Unisys plugged the drains leading to the dry well.

29. In 1988, as a result of a voluntary investigation, Unisys notified state environmental regulators of possible soil and groundwater contamination in the area of the former dry well.

30. On or about December 13, 1991, Unisys and the New York State Department of Environmental Conservation ("NYSDEC") entered into an Agreed Order on Consent ("Order"), declaring the Great Neck Site to be an inactive hazardous waste disposal site that presented a significant threat to the public health or environment. Under the terms of the Order, Unisys was required to delineate the extent of contamination, design an Interim Remedial Measure, and develop and implement a Remedial Investigation and Feasibility Study to address the releases of hazardous substances at the Great Neck Site.

31. The Order required Unisys to address both on-site contamination and off-site contamination attributable to the Great Neck Manufacturing Facility. The Order required that all work be completed in accordance with EPA's "Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA."

32. Interim remedial measures were initiated in 1993, and a Record of Decision identifying a final remedy for on-site contamination was issued by NYSDEC in 1997. The Record of Decision required Plaintiffs to implement certain remedial activities at the Great Neck Site.

33. Beginning in 1998, and continuing to the present, Lockheed Martin and Unisys entered into a series of agreements with the United States tolling the limitations period applicable to any cause of action under CERCLA for costs of response, recovery of costs and/or contribution related to environmental response costs that have been and/or may be incurred in connection with the Great Neck Manufacturing Facility.

34. Plaintiffs have incurred and will continue to incur response costs for remediation at the Great Neck Site in compliance with the Order and the Record of Decision, in an amount to be proven at trial, to facilitate an expeditious clean-up, to further the public interest, and to protect the environment. Prior to its sale of the property, Unisys incurred approximately $11 million in response costs. Since acquiring the property, Lockheed Martin has incurred more than $30 million in response costs, and anticipates that the cost of completing remediation of the soil and groundwater at the Great Neck Site could be in excess of $70 million.

## FIRST CAUSE OF ACTION

(Cause of Action under CERCLA § 107(a), 42 U.S.C. § 9607(a))

35. Plaintiffs reallege and incorporate herein by reference the allegations in paragraphs 1 through 34 inclusive, as set forth in full.

36. The United States is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), and has waived its sovereign immunity pursuant to Section 120(a) of CERCLA, 42 U.S.C. § 9620(a).

37. Lockheed Martin and Unisys are both "persons" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

38.     The Great Neck Site and Manufacturing Facility is a "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), where hazardous substances, including TCE, PCE and other volatile organic compounds, have come to be located.

39.     TCE, PCE and the other volatile organic compounds are "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

40.     The release or threatened release of hazardous substances at the Great Neck Site has caused Plaintiffs to incur "response costs," as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  Plaintiffs are incurring and will continue to incur additional response costs at the Great Neck Site.

41.     Plaintiffs' response actions taken at the Great Neck Site and the costs incurred in connection therewith were and are necessary and consistent with the National Contingency Plan, as codified at 40 C.F.R. Part 300 ("NCP").

42.     Plaintiffs have satisfied any and all conditions precedent to the undertaking of response actions, the incurrence of response costs, and the recovery of those costs under Section 107 of CERCLA, 42 U.S.C. § 9607.

43.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the United States falls within the class of persons subject to liability for past and future response costs that Plaintiffs have incurred or will incur at the Great Neck Site.  At the Great Neck Site, the United States owned, operated and controlled the land, facilities, equipment and materials used in the production of aeronautical equipment, including TCE, PCE and other volatile organic compounds and hazardous substances; and had the authority, and actually exercised its authority,

to control the use and storage of hazardous substances at the Great Neck Manufacturing Facility at the time of release or threatened release of hazardous substances, including TCE, PCE and other volatile organic compounds.

44. The United States also arranged for the disposal of hazardous substances, supplied raw materials including hazardous substances for production at the Great Neck Site, owned and controlled the work at the Great Neck Site, and knew or should have known that the generation and disposal of hazardous substances was inherent in the production processes that were performed for the United States and at the United States' direction.

## SECOND CAUSE OF ACTION

(Declaratory Relief Under CERCLA § 113(g), 42 U.S.C. § 9613(g) and the Declaratory Judgment Act, 28 U.S.C. § 2201)

45. Plaintiffs reallege and incorporate herein by reference the allegations in paragraphs 1 through 44, inclusive, as set forth in full.

46. An actual legal controversy has arisen and now exists between Plaintiffs and the United States, and Plaintiffs seek a judicial declaration of rights and legal relations with respect to the United States pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613 (g)(2) and 28 U.S.C. § 2201. Plaintiffs contend that the United States is liable to Plaintiffs under CERCLA Section 107(a), 42 U.S.C. §§ 9607(a), and that the United States is liable to Plaintiffs for their past, current, and future response costs related to the Great Neck Site. Plaintiffs are informed and believe, and based thereon allege, that the United States contends in all respects to the contrary.

47. A declaratory judgment is appropriate and is in the interests of justice because, among other reasons, it will obviate the need for multiple lawsuits in the future, thereby providing a complete resolution of the disputes between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Lockheed Martin and Unisys, pray for a judgment against the United States as follows:

a. For recovery from the United States under CERCLA for the response costs and damages relating to the Great Neck Site incurred by Plaintiffs, or for recovery of a portion of the response costs equitably allocated to the United States, in an amount to be determined at trial;

b. For pre-judgment interest at the maximum rate allowable by law, from the time Plaintiffs incurred their response costs and damages relating to the Great Neck Site;

c. For Plaintiffs' reasonable attorney's fees and costs of investigating the potential responsibility of the United States, and for conducting other reasonable and related investigations;

d. For Plaintiffs' costs of litigation;

e. For a declaratory judgment that future costs of response at the Great Neck Site will be paid in whole or in equitable part by the United States; and

f.  For such other and further relief as the Court may deem just and proper.

Dated:  August 15, 2006                    Respectfully submitted,

          /s/ Peter E. Seley
Peter E. Seley, D.C. Bar Number 440936
Michael K. Murphy, D.C. Bar Number 468907
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs Lockheed Martin Corporation and Unisys Corporation*