# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION | ) | |
| & | ) | |
| UNISYS CORPORATION | ) | |
| Plaintiffs, | ) | Case No.  06-01438 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION TO DISMISS

Peter E. Seley, D.C. Bar Number 440936
Michael K. Murphy, D.C. Bar Number 468907
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
pseley@gibsondunn.com

*Counsel for Plaintiffs Lockheed Martin Corporation
and Unisys Corporation*

TABLE OF CONTENTS

Page

I. THE FACTS PLED IN THE COMPLAINT DO NOT ESTABLISH THAT
   LOCKHEED MARTIN IS A PRP UNDER CERCLA SECTION 107(A).........................2

II. SECTION 107(A) EXPRESSLY PROVIDES THAT ANY PARTY,
    INCLUDING PRPS, CAN RECOVER NECESSARY RESPONSE COSTS
    FROM OTHER RESPONSIBLE PARTIES. ........................................................4

   A.   The Weight of Post-*Aviall* Precedent, Including This Court's *Viacom*
        Decision, Favors the Right of PRPs to Bring Section 107(a) Actions.......................5

   B.   The Plain Language of Section 107(a) Establishes the Right of PRPs to
        Bring Section 107(a) Actions................................................................9

        1.   The plain language of section 107(a)(4)(B) is unambiguous:
             claims may be brought by any person, whether or not the person
             is a PRP........................................................................................9

        2.   The government's strained reading of section 107(a)(4)(B) to
             exclude PRPs ignores the provision's plain language. ...................................11

   C.   The Legislative History and Structure of CERCLA Confirm the Right of
        PRPs to Bring 107(a) Actions................................................................14

        1.   Prior to the passage of section 113(f)(1), PRPs had the right to
             bring actions for the recovery of costs under section 107(a). ........................14

        2.   By enacting SARA, Congress did not intend to cut-back on the
             pre-existing rights of PRPs to recover costs. ..........................................17

        3.   There is no conflict between sections 107(a) and 113(f)(1); they
             work together to provide comprehensive relief and encourage
             remediation at all contaminated sites..................................................25

III. ELIMINATING CONTRIBUTION ACTIONS FOR VOLUNTARY
     CLEANUPS WOULD CREATE A CONFLICT OF INTEREST FOR THE
     UNITED STATES THAT MAY LEAD TO SIGNIFICANT REDUCTIONS IN
     CERCLA CLEANUPS. .......................................................................29

IV. IF NECESSARY, AN IMPLIED RIGHT OF CONTRIBUTION IN
    SECTION 107(a) SURVIVED PASSAGE OF SARA AND SHOULD BE
    INFERRED FROM THE PLAIN LANGUAGE OF CERCLA. .................................32

V. LOCKHEED MARTIN AND UNISYS HAVE PLED A VALID CAUSE OF
   ACTION UNDER THE DECLARATORY JUDGMENT ACT...........................34

VI.THIS COURT SHOULD DENY THE UNITED STATES' MOTION TO
  DISMISS.....................................................................................................................35

TABLE OF AUTHORITIES

Page(s)

## CASES

*Akzo Coatings Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir. 1994) ................................................. 27

*ASARCO, Inc. v. Union Pacific R.R. Co.*, No. CV 04-2144-PHX-SRB
    (D. Ariz. 2006) ....................................................................................................................... 32

*Atlantic Research Corp. v. United States*, 459 F.3d 827 (8th Cir. 2006) .................... 7, 11, 29, 30

*Barnhart v. Thomas*, 540 U.S. 20 (2003) ................................................................................... 12

*Bedford Affiliates v. Sills*, 156 F.3d 416, 424 (2d Cir. 1998) ...................................................... 29

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) ...................................................................... 17

*Carson Harbor Vill. v. County of L.A.*, 433 F.3d 1260 (9th Cir. 2006) ........................................ 20

*City of New York v. Exxon Corp.*, 633 F. Supp. 609 (S.D.N.Y. 1986) ......................................... 15

*City of Philadelphia v. Stepan Chem. Co.*, 544 F. Supp. 1135
    (E.D. Pa. 1982) ....................................................................................................................... 15

*Consol. Edison Co. v. UGI Utils., Inc.,* 423 F. 3d 90 (2nd Cir. 2005) .................................. *passim*

*Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004) ........................................ *passim*

*E.I. Du Pont De Nemours & Co. v. United States*, 297 F. Supp. 2d 740
    (D. N.J. 2003) ......................................................................................................................... 23

*E.I. DuPont De Nemours & Co. v. United States*, 460 F. 3d 515 (3d Cir. 2006) ................. 7, 8, 24

*Foster v. United States,* 922 F. Supp. 642 (D.D.C. 1996) ............................................................ 9

*Glidden Co. v. FV Steel & Wire Co.*, LEXIS 70242
    (E.D. Wisc. September 21, 2006) ........................................................................................... 24

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ........................................................................... 4

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) .............................................................. 11

*ITT Indus., Inc. v. Borgwarner, Inc.*, No. 1:05-CV-674 (W.D. Mich. 2006) ................................ 31

*Jama v. Immigration and Customs Enforcement*, 543 U.S. 335 (2005) ................................. 12, 13

*Key Tronic Corp. v. United States,* 511 U.S. 809 (1994) ............................................................. 11

*Northwest Airlines, Inc. v Transp. Workers Union*, 451 U.S. 77 (1981) ...................................... 32

*Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989) ...................................................... 16

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996) .......................................................... 16

*Syms v. Olin Corp.*, 408 F.3d 95 (5th Cir. 2005) ........................................................ 20

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) ................................ 32

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ........................................................... 3

*United States v. Hughes*, 116 F.2d 613 (3rd Cir. 1940).................................................. 12

*United States v. New Castle County*, 642 F. Supp. 1258 (D. Del. 1986)..................................... 15

*United States v. Pritchett*, 470 F.2d 455 (D.C. Cir. 1972)............................................. 12

*Viacom v. United States*, 404 F. Supp. 2d 3 (D.D.C. 2005)............................................ 8, 9, 11, 19

*W.R. Grace v. Zotos Int'l*, No. 98-CV-838S(F) (W.D.N.Y. 2005) ................................ 31

*Wickland Oil Terminals v. ASARCO*, 792 F. 2d 887 (9th Cir. 1986) ...................................... 10, 15

*Young v. United States*, 394 F.3d 858 (10th Cir. 2005)................................................ 20

## STATUTES

28 U.S.C. § 2201 .......................................................................................... 34

42 U.S.C. § 9601(21) ...................................................................................... 10

42 U.S.C. § 9607(a) ..................................................................................... 1, 5, 26

42 U.S.C. § 9607(a)(4)(A) .............................................................................. 10, 25

42 U.S.C. § 9607(a)(4)(B) ............................................................................. 9, 10, 20, 25

42 U.S.C. § 9613(f)(1) .................................................................................. 18, 28

42 U.S.C. § 9613(f)(2) ...................................................................................... 27

42 U.S.C. § 9613(g)(2) ...................................................................................... 26

42 U.S.C. § 9613(g)(3) ...................................................................................... 26

42 U.S.C. § 9620(a) ......................................................................................... 34

42 U.S.C. § 9620(a)(1)....................................................................................... 31

## REGULATIONS

40 C.F.R. § 300.700(b)(3) ........................................................................................ 20

## RULES

FED. R. EVID. 201(b), (d) ......................................................................................... 3

## FEDERAL REGISTER

Amendment to National Oil and Hazardous Substance Contingency Plan;
  48 Fed. Reg. 40,658 (Sept. 8, 1983) ................................................................... 24

## LEGISLATIVE HISTORY

H.R. REP. NO. 1016, 96th Cong., 2d Sess. (1980) ...................................................... 14

H.R. REP. NO. 253, 99th Cong., 1st Sess., Pt. 3 (1985) ............................................. 14

H.R. REP. NO. 99-253, pt. 1 (1985) ............................................................................ 21

S. REP. NO. 848, 96 Cong., 2d Sess. (1980) ............................................................... 14

126 CONG. REC. H26338 (Sept. 19, 1980) (statement of Rep. Florio) ........................ 15

131 CONG. REC. S12006 (Sept. 24, 1985) (statement of Sen. Domenici) ................... 19

131 CONG. REC. S12009 (Sept. 24, 1985) (statement of Sen. Domenici) ................... 19

## OTHER AUTHORITIES

Restatement (Second) Torts, §886A, comment b ........................................................ 28

John Pendergrass, ENVTL. LAW INST., *An Analysis of State Superfund
  Programs: 50-State Study*, 2001 Update (Nov. 2002) ............................................ 20

W. Bradford Reynolds & Lisa K. Hsiao, *The Right of Contribution Under
  CERCLA After Cooper Industries v. Aviall Services*, 18 TUL. ENVTL. L. J.
  339 (2005) ...................................................................................................... 23, 24

Milton J. Socolar, Special Assistant to the Comptroller General, Statement
  Before the Subcommittee on Commerce, Transportation, & Tourism
  (Mar. 7, 1985) ...................................................................................................... 22

National Advisory Council for Environmental Policy and Technology,
  Superfund Subcommittee Final Report (Apr. 12, 2004), *available at*
  http://www.epa.gov/oswer/docs/naceptdocs/NACEPTsuperfund-Final-
  Report.pdf ................................................................................................................ 22

Superfund 2004 Annual Report (Sept. 2005), *available at*
  http://www.epa.gov/superfund/action/process/fy2004.htm ...................................... 22

U.S. Dept. of Treasury, *Financial Report of the United States Government*
  (2005), *available at*
  https://www.fms.treas.gov.proxy.cheri.shyou.org/fr/05frusg/05frusg.pdf .............................. 29

U.S. Gen. Accounting Office, *EPA Could Benefit from Comprehensive
  Management Information on Superfund Enforcement Actions* (GAO/RCED-
  85-3) (Dec. 1984)..................................................................................................... 22

U.S. Gen. Accounting Office, *Hazardous Waste, Adequacy of EPA Attorney
  Resource Levels* (GAO/RCED-86-81FS) (Jan. 1986) ............................................ 21

U.S. Gen. Accounting Office, *Superfund Program:  Current Status and
  Future Fiscal Challenges* (GAO-03-850) (July 2003) ............................................ 30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LOCKHEED MARTIN CORPORATION  )
&                            )
UNISYS CORPORATION           )
                      Plaintiffs,  )     Case No.  06-01438 (RJL)
                                         )
        v.                              )
                                         )
UNITED STATES OF AMERICA,    )
                                         )
                      Defendant.  )

## PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION TO DISMISS

The United States of America ("United States" or the "government") has filed a motion to dismiss Lockheed Martin Corporation's and Unisys Corporation's complaint ("Complaint"), alleging that, as potentially responsible parties ("PRPs") at the Great Neck facility, Lockheed Martin and Unisys are prohibited from recovering costs under section 107(a) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a).

The motion is fundamentally flawed.  First, the United States assumes that Lockheed Martin qualifies as a PRP under CERCLA, and that assumption is an essential predicate to its motion.  But that assumption is contrary to the facts pled, which must be presumed true in the context of a motion to dismiss.  Lockheed Martin is not a PRP.  It no longer owns the Great Neck facility and did not own or operate it when the hazardous substances in question were released. Because the government cannot establish that Lockheed Martin is a PRP, an essential factual premise of the government's motion is missing.

Second, even if Lockheed Martin were a PRP, the plain language of section 107(a) expressly provides that any party, including PRPs, can recover response costs spent in

compliance with the National Contingency Plan ("NCP").  This reading of section 107(a) is the only one consistent with its plain language, its legislative history, its structure, and the primary purpose of CERCLA, which is to clean sites and allocate responsibility among responsible parties.  The government's position – that PRPs are prohibited from recovering costs under section 107(a) – misreads section 107(a) and would impermissibly expand section 113(f)(1).  In so doing, the United States fails to account for the Supreme Court's decision in *Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004) ("*Aviall*"), which clarified the relationship between sections 107(a) and 113(f)(1).  In short, both Lockheed Martin and Unisys have stated a valid claim for relief under section 107(a), whether or not they qualify as PRPs, and the United States' motion should be denied.

## I.    THE FACTS PLED IN THE COMPLAINT DO NOT ESTABLISH THAT LOCKHEED MARTIN IS A PRP UNDER CERCLA SECTION 107(A).

Essential to the United States' motion to dismiss Lockheed Martin's claims is the assertion that Lockheed Martin is a PRP, but that assertion is contrary to the facts pled in the Complaint and, more importantly, is simply inaccurate.  The government states that, "[a]s the current owner of the Facility, Compl. ¶¶ 2-3, Lockheed is a PRP under section 107(a)(1)."  United States' Motion to Dismiss ("Motion") at 8.  But the Complaint does not allege that Lockheed Martin is the current owner of the facility.  To the contrary, although the operative transaction was not described in the Complaint, Lockheed Martin sold the Great Neck Facility to a company called i.Park Lake Success LLC in 2000, and has not had any ownership interest in the facility for the past six years.  *See* Affidavit of Peter E. Seley, attached hereto, ¶¶ 3-5.[1]

---

[1] Plaintiffs request that the Court take judicial notice of Lockheed Martin's sale of the facility, which – as demonstrated in the materials provided in the Affidavit of Peter E. Seley – is a

[Footnote continued on next page]

Moreover, the allegations in the Complaint cannot be read to suggest that Lockheed Martin would be a PRP under any other provisions in CERCLA section 107(a). The hazardous substances at issue in this case were disposed of long before Lockheed Martin owned or operated the facility, so Lockheed Martin could not be considered a PRP under CERCLA section 107(a)(2).[2] And the government concedes that the Complaint does not contain allegations establishing that Lockheed Martin qualifies as an arranger of hazardous substances under CERCLA section 107(a)(3), or as a transporter of hazardous substances under CERCLA section 107(a)(4). *See* Motion at 8, n.8.[3]

Accordingly, the thrust of the government's motion – that the causes of action pled in the Complaint are not available to PRPs – simply misses the mark regarding plaintiff Lockheed Martin. The Court can dismiss a complaint based upon FED. R. CIV. P. 12(b)(6) only if it can

---

[Footnote continued from previous page]
matter of public record that is not subject to reasonable dispute and is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. FED. R. EVID. 201(b), (d). As noted in the materials provided, the government was made aware of Lockheed Martin's sale of the facility long before it filed the present motion to dismiss. *Id.* at ¶ 5.

[2] As noted in the Complaint, TCE and PCE were not used at the facility after 1979, Complaint at ¶ 25, and the drains leading to the drywells that are the presumed source of contamination at the facility were plugged in 1978. Complaint at ¶ 28. Loral purchased the Great Neck Facility in 1995, and in 1996, Lockheed acquired the facility when Lockheed Martin Tactical Systems was formed by a merger between Loral and LAC Acquisition Corporation. Complaint at ¶¶ 2-3. Thus, the facts pled in the Complaint show that any release of hazardous substances at issue at the facility ended more than 15 years before Lockheed Martin acquired the property.

[3] Even if the government asserted that the facts pled in the Complaint were ambiguous with regard to whether Lockheed Martin could be considered a PRP, which they are not, that ambiguity would not be enough to rescue the government's motion. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (in considering a motion to dismiss, "plaintiff [must be granted] the benefit of all reasonable inferences from the facts alleged." (internal citations omitted)).

determine with certainty that the plaintiff cannot prove any set of facts that would allow relief under the allegations in the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Even if the government were correct that PRPs may not bring claims under CERCLA section 107(a), which it is not, the United States cannot prove, and the facts pled in the Complaint do not show, that Lockheed Martin is a PRP. The government's motion to dismiss Lockheed Martin's claims must be denied for this reason alone.

## II.    SECTION 107(A) EXPRESSLY PROVIDES THAT ANY PARTY, INCLUDING PRPS, CAN RECOVER NECESSARY RESPONSE COSTS FROM OTHER RESPONSIBLE PARTIES.

Setting aside for a moment the basic question of whether Lockheed Martin is a PRP, which itself disposes of the government's motion as to Lockheed Martin, the government's general assertion that causes of action under CERCLA section 107(a) are unavailable to PRPs is wrong; it offends the plain language of that section, its context, and its legislative history. Section 107(a) of CERCLA provides in relevant part:

> (a)    Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date.
>
> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
>
>    (1) the owner and operator of a vessel or a facility,
>
>    (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
>    (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
>    (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites

selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

*(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;*

42 U.S.C. §9607(a) (emphasis added).  It is the interpretation of section 107(a)(4)(B), emphasized above, that is the focus of the government's motion.

The government asserts, in a nutshell, that the "any other person" language of section 107(a)(4)(B) does not serve to distinguish the "person" described in that section from "the United States Government or a State or an Indian tribe" described in section 107(a)(4)(A).  Rather, the government asserts that when Congress said in section 107(a)(4)(B) that PRPs shall be liable for costs incurred by "any other person," it really meant that PRPs would be liable for costs incurred by any person other than another PRP.  For a host of reasons, including the plain text of the statute, various canons of statutory interpretation, the context of the section, and the purpose of the section evident from its legislative history, the Court should reject the government's proposed interpretation.

### A.    The Weight of Post-*Aviall* Precedent, Including This Court's *Viacom* Decision, Favors the Right of PRPs to Bring Section 107(a) Actions.

As an initial matter, the government desperately overreaches when it asserts in its motion that "most of the courts of appeals would dismiss the action."  Motion at 9.  The cases that the government relies on in making that assertion were almost all decided before the Supreme Court's landmark decision in *Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157.  In *Aviall*, the Supreme Court overwrote years of prior circuit court decisions that had interpreted CERCLA section 113(f)(1) broadly – permitting section 113(f)(1) contribution actions only after a pre-

existing civil action under section 106 or 107.  *Id*. at 168.  The Supreme Court expressly

identified and left open the question now facing this Court – whether in light of its holding PRPs

may pursue claims under CERCLA section 107(a).  The *Aviall* Court noted that the prior

decisions of courts of appeals on this issue (the same cases that the government relies on in its

motion) had been called into question by its restrictive interpretation:

> [W]e would have to consider whether these decisions are correct, an issue that
> Aviall has flagged but not briefed.  And we might have to consider other issues,
> also not briefed, such as whether Aviall, which seeks to recover the share of its
> cleanup costs fairly chargeable to Cooper, may pursue §107 cost recovery action
> for some form of liability other than joint and several.  We think it more prudent
> to withhold judgment on these matters.

*Id*. at 169-170.

The dissent in *Aviall* was not as reticent, and suggested that there was no reason to wait to

decide whether CERCLA section 107(a) causes of action were available to PRPs.  Justices

Ginsberg and Stevens noted that the answer was not really in dispute:

> In *Key Tronic Corp. v. United States*, all Members of this Court agreed that § 107
> of the Comprehensive Environmental Response, Compensation, and Liability Act
> of 1980 (CERCLA), "unquestionably provides a cause of action for [potentially
> responsible persons (PRPs)] to seek recovery of cleanup costs." The Court rested
> that determination squarely and solely on § 107(a)(4)(B), which allows any
> person who has incurred costs for cleaning up a hazardous waste site to recover
> all or a portion of those costs from any other person liable under CERCLA.
>
> *        *        *
>
> [N]o Justice expressed the slightest doubt that § 107 indeed did enable a PRP to
> sue other covered persons for reimbursement, in whole or part, of cleanup costs
> the PRP legitimately incurred.

*Id.* at 172 (citations omitted).

Since the Supreme Court's decision in *Aviall*, three circuit courts have addressed the

question of whether PRPs may maintain an action under section 107(a).  The Second Circuit and

the Eighth Circuit both found that PRPs may pursue original actions under section 107(a).  *See*

*Consol. Edison Co. v. UGI Utils., Inc.,* 423 F. 3d 90 (2nd Cir. 2005) (cert. petition pending);

*Atlantic Research Corp. v. United States*, 459 F.3d 827 (8th Cir. 2006) (cert. petition pending).

The Third Circuit, on the other hand, determined that it was bound by its pre-*Aviall* precedent

prohibiting PRPs from filing section 107(a) actions. *See E.I. DuPont De Nemours & Co. v.*

*United States*, 460 F. 3d 515 (3d Cir. 2006).[4]

The Second and Eighth Circuits were categorical in rejecting the notion that section

107(a) actions are unavailable to PRPs. The Second Circuit held in *Consolidated Edison* that the

plain language of CERCLA permits PRPs to file suit under section 107(a):

> [D]etermining whether a [plaintiff who has not been subject to a civil action] may
> sue under section 107(a) is easily resolved based on that section's plain language.
> Section 107(a) makes parties liable for the government's remedial and removal
> costs and for "any other necessary costs of response incurred by any other person
> consistent with the national contingency plan."

423 F.3d at 99. The Eighth Circuit agreed: "We reject an approach which categorically deprives

a liable party of a § 107 remedy. Like the Second Circuit, we return to the text of CERCLA, and

find no such limitation in Congress's words." *Atlantic Research Corp.*, 459 F. 3d at 835.

While the Third Circuit in *DuPont* reached a different conclusion, it did not do so based

on an alternative interpretation of the plain language of section 107, but rather on a questionable

recitation of the statutory history and structure of CERCLA. Judge Sloviter dissented forcefully

in *DuPont*, criticizing the majority for failing to fairly consider the plain language of section

107(a):

---

[4]    Although the majority in *DuPont* considered itself bound by its pre-*Aviall* interpretation of
CERCLA, Judge Sloviter in his dissent concluded that *Aviall* was the type of intervening
authority that "should impel us to reevaluate our precedent because [*Aviall*] weakens the
conceptual underpinnings of our decisions." *Id.* at 545 (J. Sloviter, dissenting).

> There is nothing in the relevant language of § 107 that compels the result the majority
> reaches.  Section 107 states that various parties, including the owner or operator of a
> facility, may be responsible for "any . . . necessary costs of response incurred by any
> other person consistent with the national contingency plan," § 107(a)(4)(B), and provides
> a cause of action to parties that incur cleanup costs but have not themselves been sued
> under § 106 or § 107.

*DuPont*, 460 F. 3d at 546 (J. Sloviter, dissenting).  So, contrary to the government's contention,

the weight of the post-*Aviall* circuit court authority supports Lockheed Martin and Unisys's

claims, and provides a strong indication that the government's interpretation of CERCLA is

incorrect.[5]

Further, this court has addressed the question of whether CERCLA section 107(a)

provides a cause of action to PRPs.  In *Viacom v. United States*, a case presenting a fact pattern

fundamentally similar to the present case, the plaintiff was, as described by the government in its

motion, "the current owner and a PRP at the particular site [who] sought to recover response

costs from the United States, which [the plaintiff] alleged to be a PRP at the Site as well, under

section 107(a)."  Motion at 13.

The *Viacom* court noted that "the question whether a PRP may seek to recover its costs

via § 107(a) is in fact one of first impression in this Circuit, and is one as to which courts

elsewhere have recently reached divergent decisions."  404 F. Supp. 2d 3, 6 (D.D.C. 2005).

After analyzing the conflicting case law, however, the *Viacom* court found that "[m]any of the

district court rulings rejecting PRPs' § 107(a) cost recovery actions rest on pre-*Aviall* circuit

court decisions that earlier rejected such suits."  *Id*.  The court found that those circuit court

---

[5]    In addition to the three cases described above, the question of whether PRPs may file suit
under section 107(a) is currently pending in at least two other circuits:  the Ninth Circuit in
*City of Rialto v. U.S. Dep't of Defense*, Case No. 05-567449 and consolidated cases; and the
Seventh Circuit in *Metropolitan Water Reclamation District v. North American Galvanizing
Coatings, Inc.*, Case No. 05-3299.

precedents were unpersuasive: "in light of the sea change currently in progress as a result of the Supreme Court's recent decision, this Court declines to follow the precedents that rejected a PRP's right to bring a § 107(a) action prior to *Aviall*." *Id.* at 7.  Instead, this court analyzed the language, purpose, and history of section 107(a), and held that "a plain reading of § 107 shows that anyone – whether a PRP or not – may sue thereunder to recover its response costs." *Id.*[6]

**B.    The Plain Language of Section 107(a) Establishes the Right of PRPs to Bring Section 107(a) Actions.**

The Supreme Court in *Aviall* repeatedly emphasized that the interpretation of CERCLA's provisions must be dictated by the plain meaning of the statutory text.  *See* 543 U.S. at 163 ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").  That principle should dispose of the issue here because the plain language of section 107(a) authorizes ***any*** person who has engaged in the remediation of hazardous waste to recover its clean-up costs.  42 U.S.C. § 9607(a)(4)(B).

**1.    The plain language of section 107(a)(4)(B) is unambiguous: claims may be brought by any person, whether or not the person is a PRP.**

Section 107(a), the so-called "cost recovery" section of CERCLA, is not complicated: it describes four categories of persons who are liable under the statute in subparagraphs (1) through (4), and then states that a party so described "shall be liable" to (A) the United States, States and

---

[6]    Defendant attempts to evade *Viacom* by citing a ten-year old, pre-*Aviall* case, *Foster v. United States,* 922 F. Supp. 642 (D.D.C. 1996), claiming that "[t]his Court's decisions have been inconsistent."  Motion at 12.  *Foster*, however, was decided before *Aviall* reinterpreted section 113, and did not consider the question of whether a PRP who did not qualify for a section 113(f)(1) claim could assert an original action under section 107(a).  Moreover, as the *Viacom* court noted, to the extent *Foster* even addressed the proper interpretation of section 107(a), it "reached this question merely in dictum, and did so in a summary fashion that neither analyzed the relevant statutory provisions prior to *Aviall* nor cited case law to support its statement."  *Viacom*, 404 F. Supp. 2d at 8 n.2.

Indian Tribes for response costs not inconsistent with the National Contingency Plan, and (B) any other persons for response costs consistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(A)-(B). Clauses (A) and (B) complement each other, creating a structure that permits government agencies and Indian Tribes to recover costs with a presumption of compliance with the NCP ("not inconsistent with the [NCP]"), and other persons to recover costs that they establish are "consistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(A)-(B). *See also Wickland Oil Terminals v. ASARCO*, 792 F. 2d 887, 891 (9th Cir. 1986) (interpreting subsections (A) and (B) as complementary and stating that "[t]he word 'other' in section 107(a)(4)(B) reasonably functions to distinguish between government response costs in part (A) and private response costs in part (B)"). In other words, section 107(a)(1)-(4) describes a person that is liable, and section 107(a)(4)(A)-(B) indicates to whom and for what that person is liable.

The government has conceded, for the purposes of this motion, that it is a PRP, liable under CERCLA section 107(a). Lockheed Martin and Unisys are not the United States, a State, or an Indian tribe, *see* section 107(a)(4)(A), but rather are "other person[s]" that have incurred necessary costs of response to which the government is liable. *See* section 107(a)(4)(B). The term "person" is specifically defined in CERCLA in the broadest possible terms: "The term 'person' means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." *See* 42 U.S.C. § 9601(21). Under the

unambiguous language of the statute, Lockheed Martin and Unisys have a cause of action against the United States.[7]

As noted above, those post-*Aviall* cases that have analyzed the plain language of section 107(a) have generally agreed with this interpretation. For example, in *Atlantic Research Corp.*, the Eighth Circuit adopted a straightforward reading of section 107(a)(4)(B): "We have held that 'any other person' means any person other than the statutorily enumerated 'United States Government or a State or an Indian tribe.' Atlantic is such a 'person,' and no one disputes its having incurred 'necessary costs of response.' On its face § 107 applies." 459 F. 3d at 835 (internal citations omitted). *See also, e.g., Consol. Edison,* 423 F.3d at 99; *Viacom*, 404 F. Supp. 2d at 6.

> ### 2. The government's strained reading of section 107(a)(4)(B) to exclude PRPs ignores the provision's plain language.

In the face of Plaintiffs' straightforward interpretation, the government espouses an alternative reading of section 107(a) that needlessly contorts the plain language and structure of

---

[7] *See, e.g., Key Tronic Corp. v. United States,* 511 U.S. 809, 822 (1994) ("Section 107(a)(4)(B) states, as clearly as can be, that 'covered persons . . . shall be liable for . . . necessary costs of response incurred by any other person.' Surely to say that A shall be liable to B is the express creation of a right of action." (Scalia, J. dissenting)). In *Key Tronic,* the Court concluded that one PRP was entitled to recover response costs from another PRP under Section 107(a). *Id.* at 815-816. The focus of the Court's analysis, however, was directed to whether Section 107 "*impliedly* authorizes private parties to recover cleanup costs from other PRPs," as the majority held, *id.* at 818 (emphasis added), or whether it *expressly* did so—as the dissenters urged. *Id.* at 822 (Scalia, J., dissenting). As Justice Ginsburg noted in her dissent in *Aviall,* every member of the *Key Tronic* Court agreed that a PRP which incurred response costs could recover those costs under § 107(a). 543 U.S. at 172-173 (Ginsburg, J., dissenting). Although the *Aviall* Court termed this discussion in *Key Tronic* as "dicta," *id.* at 170, its discussion of 107(a)(4)(B) is nonetheless still significant because it confirms that all members of the Court expressed the view (whether dicta or not) that Section 107(a) authorized a PRP to sue another PRP. *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935) (noting that while not controlling, dicta can still act as persuasive authority).

the section and has never been accepted by any court.  Rather than read the modifier "other" in

the phrase "any other party" to distinguish private parties in section 107(a)(4)(B) from

government entities in 107(a)(4)(A), the government asserts that the "other" modifier leapfrogs

over the immediately preceding phrase (section 107(a)(4)(A)), and applies instead to the

definition of liable parties in sections 107(a)(1)-(4).  Motion at 14.  Such a convoluted

construction violates a variety of interpretive canons, and wholly ignores the Supreme Court's

exhortation in *Aviall* to focus on the "clear meaning of the text" of CERCLA.  *Aviall*, 543 U.S. at

167.

In advocating "a grammatical contortion so often attempted that its denial has found its

way into a rule of law," *United States v. Hughes*, 116 F.2d 613, 616 (3rd Cir. 1940), the United

States offends "one of the simplest canons of statutory construction." *United States v. Pritchett*,

470 F.2d 455, 459 (D.C. Cir. 1972) (quoting *Hughes*, 116 F.2d at 616).  The "Rule of the Last

Antecedent" states that "qualifying phrases are to be applied to the words or phrase *immediately*

*preceding* and are *not* to be construed as extending *to others more remote*."  *Pritchett*, 470 F.2d

455, 459 (emphasis added).

The United States Supreme Court recently has endorsed this interpretive rule.  In

*Barnhart v. Thomas*, 540 U.S. 20 (2003), a statute referred first to a claimant's "previous work"

and then to "any other kind of substantial gainful work which exists in the national economy."

*Id.* at 26.  Applying the rule of the last antecedent, the Supreme Court declined to read the

limiting clause "which exists in the national economy" into the term "previous work." *Id.* at 26-

28.  In *Jama v. Immigration and Customs Enforcement*, a case that was, surprisingly, cited by the

government, the statute in question stated that "[i]f . . . impossible to remove [an] alien to each

country described in a previous clause of this subparagraph, [the Attorney General shall remove

the alien to] another country *whose government will accept the alien* into that country."  543 U.S.

335, 340 (2005).  The petitioner claimed that "whose government will accept the alien" applied

not only to the "country" immediately preceding the phrase, but to countries described elsewhere

in the subparagraph.  In short, the petitioner "seize[d] upon the word 'another' in [the] clause . . .

as a means of importing the acceptance requirement into [other] clauses."  *Id*. at 342.  That, said

the Court, is contrary to the rule of the last antecedent, and "stretches the modifier too far."  *Id*.

Here, the United States invites this Court to similarly elasticize the modifier in the section

107(a)(4)(B) phrase "any other person" to relate back to five other descriptions of persons in four

separate, remote subparagraphs.  Such a reading "stretches the modifier too far," and is against

sound rules of grammar and statutory interpretation.

The United States can point to no post-*Aviall* decision that has accepted its "leapfrog"

approach.  *See Consol. Edison*, 423 F.3d at 99 (finding "no basis for reading into this language a

distinction between so-called 'innocent' parties and parties that, if sued, would be held liable

under section 107(a)").  Even the Third Circuit in *DuPont*, which found (Plaintiffs submit

incorrectly) that PRPs could not bring claims under section 107(a), did not adopt the

government's reading.

The present case amply illustrates the illogic of the government's reading of section

107(a).  Under the government's reading, the current owner of the Great Neck facility, an

innocent landowner with no connection whatsoever to the contamination at the property, would

not be able to bring an action to recover any costs it spent to clean up because it is "the owner

and operator of a vessel or a facility," and thus is a PRP under section 107(a)(1).  If that same

innocent landowner sold the property tomorrow, under the government's interpretation of the

statute, a cost recovery action would instantly become available to it because it would no longer

be considered a PRP.  CERCLA cannot be read to endorse that type of arbitrariness through

disparate treatment of similarly situated parties that have incurred response costs.

Nothing in the language of section 107(a)(4)(B) suggests, let alone compels, adoption of

the government's leapfrog approach to statutory interpretation.  To the contrary, the plain

language and logical structure of section 107(a) counsels against the government's approach, and

the "Rule of the Last Antecedent," an age-old and recently affirmed canon of statutory

interpretation, dictates against it.

> **C.    The Legislative History and Structure of CERCLA Confirm the Right
> of PRPs to Bring 107(a) Actions.**

The plain language of section 107(a), allowing any person, including PRPs, to recover

necessary response costs under CERCLA, is confirmed by the statute's legislative history and

structure.

> **1.    Prior to the passage of section 113(f)(1), PRPs had the right to
> bring actions for the recovery of costs under section 107(a).**

Congress enacted CERCLA to accomplish two goals: "(1) to provide for clean-up if a

hazardous substance is released into the environment or if such release is threatened, and (2) to

hold responsible parties liable for the costs of these clean-ups."  H.R. REP. NO. 253, 99th Cong.,

1st Sess., Pt. 3, at 15 (1985).  Congress intended both goals to be achieved by promoting

Government initiated clean-ups and *voluntary* clean-up efforts by the private sector – efforts

Congress sought to encourage through enactment of the liability and remedial provisions of

section 107(a).  *See* H.R. REP. NO. 1016, 96th Cong., 2d Sess., at 17 (1980) ("Section 107(a)'s

strict liability regime was enacted "*to induce persons voluntarily* to pursue appropriate

environmental response actions with respect to inactive hazardous waste sites.").  *See also* S.

REP. NO. 848, 96 Cong., 2d Sess., at 31 (1980) ("This liability standard is intended to induce

potentially liable persons to *voluntarily mitigate damages* rather than simply rely on the government to abate hazards.") (emphasis added).[8]

CERCLA expressed this goal by granting PRPs the explicit right to pursue actions under section 107(a) to recover voluntarily incurred cleanup costs. "This expressed goal of achieving voluntary cleanup is directly enhanced by Congress including in Section 107(a)(4)(B) the ability of responsible persons to recover voluntarily incurred response costs from other responsible persons." *United States v. New Castle County*, 642 F. Supp. 1258, 1264 (D. Del. 1986). In applying section 107(a)(4)(B) prior to the passage of the Superfund Amendments and Reauthorization Act ("SARA") of 1986, numerous courts found that a PRP "that had incurred response costs, but that had done so voluntarily and was not itself subject to suit, had a cause of action for cost recovery against *other PRPs*." *Aviall,* 543 U.S. at 161 (emphasis added). *See Wickland Oil Terminals*, 792 F.2d at 892 (holding that section 107(a) provides a private right of cost recovery independent from government action); *City of New York v. Exxon Corp.*, 633 F. Supp. 609, 616-17 (S.D.N.Y. 1986) (stating, before the enactment of section 113(f)(1), that the "private recovery provisions of [CERCLA] . . . assure an incentive for private parties, *including those who may themselves be subject to liability under the statute*, to take a leading role in cleaning up hazardous waste facilities as rapidly and completely as possible.") (emphasis added); *City of Philadelphia v. Stepan Chem. Co.*, 544 F. Supp. 1135 (E.D. Pa. 1982) (finding that a PRP could pursue an action under section 107(a)).

---

[8]  *See also* 126 CONG. REC. H26338 (Sept. 19, 1980) (statement of Rep. Florio) ("[Section 107] accomplishes three objectives. It assures that the costs of chemical poison releases are borne by those responsible for the releases. It creates a strong incentive both for prevention of releases *and voluntary cleanup* of releases by responsible parties." (emphasis added)).

Indeed, in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989), the controlling plurality of the Court recognized that the private cause of action afforded by CERCLA "is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *Id.* (citations omitted) (emphasis in original). *Union Gas* went on to explain that the entire purpose of CERCLA's remedial scheme was to encourage voluntary remediation by providing PRPs a cause of action against other PRPs for response costs:

> Congress did not think it enough, moreover, to permit only the Federal Government to recoup the costs of its own cleanups of hazardous waste sites; the Government's resources being finite, it could neither pay up front for all necessary cleanups nor undertake many different projects at the same time. Some help was needed, and Congress sought to encourage that help *by allowing private parties who voluntarily cleaned up hazardous-waste sites to recover a proportionate amount of the costs of cleanup from **other** potentially responsible parties.*

*Id.* at 21-22 (emphasis added).[9]

While the statute was seen as explicit in allowing PRPs that voluntarily incurred response costs to bring initial actions against other PRPs, the statute was silent concerning ***derivative contribution*** actions and "whether a private entity that ***had been sued*** in a cost recovery action (by the Government or ***by another PRP***) could obtain contribution from other PRPs." *Aviall*, 543 U.S. 162 (emphasis added). Courts addressing this issue before SARA implied this right of contribution from the provisions of the statute or as a matter of federal common law. *See id.* Prior to SARA, then, two types of actions were available to private PRPs: (1) ***original*** suits to

---

[9] No Justice disagreed with this analysis. Justice Scalia concurred with the plurality that Congress sought in CERCLA to abrogate the States' sovereign immunity, but he (along with three other Justices) concluded that Congress lacked the power to do so. *See Union Gas*, 491 U.S. at 29 (Scalia, J., dissenting in part). That latter view prevailed in *Seminole Tribe v. Florida*, 517 U.S. 44, 66 (1996), which reversed *Union Gas* on Eleventh Amendment issues but not on the interpretation of CERCLA set forth above.

recover response costs under the plain language of section 107(a)(4)(B), and (2) implied

contribution for actions *after* an original lawsuit was filed.

**2.    By enacting SARA, Congress did not intend to cut back on the pre-existing rights of PRPs to recover costs.**

In recounting the history of section 113(f)(1) to support its position, the United States

significantly omits the fact that pre-SARA courts not only had implied contribution actions for

PRPs in section 107(a), s*ee* Motion at 16, but also had recognized the right of PRPs to file

*original actions* based upon the statute's plain language.  *See Aviall*, 543 U.S. at 164.  That

omission is significant.

It is now clear after *Aviall* that Congress added section 113(f)(1) in the 1986 SARA

amendments to address *only* the second type of action, derivative contribution actions, leaving

the right of PRPs to file an original action under section 107(a) untouched.  Nothing in SARA

modified the language of section 107(a), and nothing in the legislative history expressed a desire

to abrogate the validity of decisions such as *Wickland Oil* and *City of Philadelphia v. Stepan*

*Chemical*.  Because Congress did not alter the right of PRPs in SARA to recover costs under

section 107(a)(4)(B), which had been recognized in these decisions, that right necessarily

survived SARA.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979) (holding that

Congress is presumed to know of prior court interpretations and that its actions are to "be

interpreted in conformity with them").  Any rescission of the right of PRPs to file original actions

to recover their costs would have severely chilled voluntary cleanups, and there is no evidence

that Congress sought such a result.[10]

--------

[10]  The United States argues that there is an isolated statement in the legislative history
      recognizing the United States' right to file section 107(a)(4)(A) suits after SARA, arguing

[Footnote continued on next page]

17

Section 113(f), added by SARA, provides a cause of action only after an initial cost recovery action is filed or after a person settles their CERCLA liability with the United States or a State. *See* 42 U.S.C. §§9613(f)(1), (3). By its terms, it does not apply to persons who have expended response costs and do not qualify for section 113(f)(1) relief. And Congress was very clear that its enactment of SARA was not intended to upset the rights that had developed under the original statute. SARA included in Section 113(f)(1) a savings clause, which provides that "[n]othing in this subsection shall diminish the right of ***any person*** to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title." 42 U.S.C. § 9613(f)(1) (emphasis added). The Supreme Court explained that this clause "***rebuts any presumption*** that the express right of contribution provided by the enabling clause [in Section 113(f)(1)] is the ***exclusive*** cause of action for contribution available to a PRP." *Aviall*, 543 U.S. at 166-167 (emphasis added). Section 113(f)(1), therefore, "does nothing to diminish any cause(s) of action for contribution that may exist independently of § 113(f)(1)." *Aviall,* 543 U.S. at 166.

Likewise, Congressional support for voluntary cleanups was unabated during consideration of SARA. The goal of CERCLA is to achieve effective and expedited cleanup of

---

[Footnote continued from previous page]
  that this statement proves the negative; *i.e.,* that the lack of explicit statements guaranteeing a right of action for PRPs means that Congress intended to abrogate that right. *See* Motion at 28-29. The United States' argument suffers from the obvious logical fallacy of false cause, or *cum hoc, ergo propter hoc* (literally, "with this, therefore because of this"). Just because the House Committee on Energy and Commerce inserted a single statement into the legislative history clarifying that SARA did not affect the rights of the United States does not imply Congress intended to confine all PRPs actions to section 113(f)(1). The House Report cited by the United States is absolutely silent on the rights of voluntary PRPs, and the relevance of any negative implication that could be drawn from the passage's failure to mention PRPs is far outweighed by the persuasive force of the extensive provisions of CERCLA and SARA's legislative history establishing that the statutes were designed to promote voluntary remediation of hazardous waste.

as many uncontrolled hazardous waste facilities as possible.  One important component of a realistic strategy to reach that goal is the "encouragement of *voluntary* cleanup actions or funding *without having the President relying on the panoply of administrative and judicial tools available*."  131 CONG. REC. S12009 (Sept. 24, 1985) (statement of Sen. Domenici) (emphasis added).  This court in *Viacom* agreed with this proposition, concluding that "the legislative history of § 113(f). . . evidences a Congressional intent to allow contribution claims under the preexisting § 107(a) in addition to those under the new section."  404 F. Supp. 2d at 16.

  The government, in contrast, relies heavily on the Third Circuit's ruling in *DuPont*, which found that Congress in SARA sought to limit CERCLA contribution actions by PRPs only to those who have secured "negotiated cleanups under the government['s] supervision."  Motion at 27.  The government asserts that "the legislative history does not support a claim that Congress intended to provide a remedy to parties such as plaintiffs who conducted their cleanup outside the context of a negotiated settlement."  *Id.* at 28.  The United States does not claim that this limitation appears in the text of SARA, nor does it point to any statements in either CERCLA or SARA's legislative history that explicitly endorse it.  Moreover, the government concedes that the Second and Eighth Circuits, as well as this court, all found that the legislative history supported the opposite position, that SARA creates no such limitation.  *Id*.  Nonetheless, the assertion that only cleanups conducted in the context of negotiated settlements can be reimbursed under section 107(a) has become a centerpiece of the government's argument.

  As noted above, the legislative history demonstrates a congressional preference for settlement over protracted litigation, but nowhere prohibits cost recovery claims based on voluntary cleanups.  *See, e.g.,* 131 CONG. REC. S12006 (Sept. 24, 1985) (statement of Sen. Domenici) ("what we have tried to do in this amendment is to refocus the intent of the program

back on cleaning up the sites and away from the slow and costly litigation…. What we are offering is a modest proposal to try to encourage responsible parties to come to the table and settle with EPA and get on with the business of cleaning up the sites….").[11]

Moreover, the notion – expressed by the *DuPont* court and by the government in its motion – that negotiated cleanups are somehow more protective of the environment than voluntary cleanups, is misguided. Motion at 27. Section 107(a) does not grant an unregulated right of contribution to all PRPs for any cleanup costs incurred. For voluntary cleanups to qualify for cost recovery, they need to be "necessary" and meet the strict standards of the National Contingency Plan, which "results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(b)(3). CERCLA's approach to this issue is much more elegant than the oversight requirement imagined by the Third Circuit. Instead of imposing a cumbersome bureaucratic review process on every cleanup, CERCLA relies on financial incentives. Parties are discouraged from performing inadequate or ineffective cleanups, because they will be unable to recover their costs from other parties if they cannot prove that their costs were "necessary" and "consistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(B).[12] Voluntary, independent cleanups

---

[11] As discussed above, voluntary cleanups have always been an essential aspect of CERCLA's statutory and regulatory scheme since its enactment. By one estimate, over 15,000 cleanups were underway outside of EPA oversight in 2001 alone. John Pendergrass, ENVTL. LAW INST., *An Analysis of State Superfund Programs: 50-State Study*, 2001 Update 16-17 (Nov. 2002).

[12] Courts have enforced those standards, routinely reviewing the cleanups underlying section 107(a) claims to ensure they are necessary and consistent with the NCP. *See, e.g., Carson Harbor Vill. v. County of L.A.*, 433 F.3d 1260 (9th Cir. 2006) (section 107(a) claim denied on grounds cleanup failed public comment requirement); *Syms v. Olin Corp.*, 408 F.3d 95 (5th Cir. 2005) (damages caused by cleanup not recoverable under section 107(a)); *Young v. United States*, 394 F.3d 858 (10th Cir. 2005) (rejecting costs incurred in evaluating a site

[Footnote continued on next page]

have always been an integral part of the CERCLA scheme, and the Third Circuit's attempt to

subjugate them all to EPA supervision is unnecessary and conflicts with the text of the statute

and accompanying regulations.

        Also problematic for the United States' argument, and also ignored by the Third Circuit,

is that Congress was well aware in 1986 that EPA was not in any position to take on a more

comprehensive oversight role.  EPA's initial handling of CERCLA had been a monumental

disaster and the fallout had devastated the agency.[13]  But EPA's problems with CERCLA went

beyond severe mismanagement.  Throughout the years prior to the enactment of SARA, the

General Accounting Office issued numerous reports to Congress on the progress of EPA and

CERCLA.  The reports painted a bleak picture of an agency overwhelmed and understaffed,

unable to meet the requirements of CERCLA or the expectations of Congress.[14]

------

[Footnote continued from previous page]
    because no cleanup costs were incurred; citing numerous cases defining the "necessary"
    prong).

[13]  The House Report accompanying SARA neatly summarized the scandal:  "Under the initial
    leadership of Assistant Administrator Lavelle, the program was victimized by gross
    mismanagement…. [after a Congressional investigation] over twenty top-level officials,
    including the Administrator of the EPA, resigned or were fired from their jobs.  Assistant
    Administrator Lavelle is currently serving a jail term [for lying to Congress]."  H.R. Rep. No.
    99-253, pt. 1, at 55 (1985).

[14]  Some excerpts from the reports:

    "Nearly all of the legal and program officials we talked to told us that more attorneys are
    needed….  As of September, 1985, Region I had 37 responsible party negotiations ongoing.
    [EPA] estimated that about four of these cases had reached the point in negotiations where an
    agreement to do the remedial Superfund site investigation and feasibility study could be
    signed; however, no attorneys were available to prepare the settlement documents so that
    work could begin."  U.S. Gen. Accounting Office, *Hazardous Waste, Adequacy of EPA
    Attorney Resource Levels* (GAO/RCED-86-81FS) (Jan. 1986).

[Footnote continued on next page]

Perhaps the most dramatic aspect of the situation revealed by these reports is how small a portion of the hazardous waste problem had already overwhelmed EPA. By August of 1984, EPA had only 125 negotiations ongoing, and had concluded only 152 since CERCLA's enactment nearly four years earlier; only a small fraction of even the priority sites were receiving any government attention. U.S. Gen. Accounting Office, *EPA Could Benefit from Comprehensive Management Information on Superfund Enforcement Actions*, ii (GAO/RCED-85-3) (Dec. 1984). It is inconceivable that Congress would have intended to channel all future cleanups through a bureaucratic process that, in 1984, had failed to effectively manage more than a few cleanup negotiations.

While EPA's performance with respect to CERCLA has improved over the years, the level of regulatory oversight required by the Third Circuit's interpretation remains unrealistic. EPA's enforcement budget (defined as "searching for and negotiating agreements with responsible parties") is approximately $160 million annually. National Advisory Council for Environmental Policy and Technology, Superfund Subcommittee Final Report, 20-24 (April 12, 2004), *available* at http://www.epa.gov/oswer/docs/naceptdocs/NACEPTsuperfund-Final-Report.pdf. Yet, EPA finalizes less than one hundred settlements per year. *See* Superfund 2004 Annual Report (Sept. 2005), *available at* http://www.epa.gov/superfund/action/process/fy2004.htm. Under the Third Circuit's interpretation, all sites would have to wade through the EPA settlement process before cleanups could begin.

_____

[Footnote continued from previous page]

"Information as to the number of hazardous waste sites in this country and the extent of health risks associated with them is incomplete. The Congress, EPA, and the public cannot be sure that human health and the environment are being adequately protected." Milton J. Socolar, Special Assistant to the Comptroller General, Statement Before the Subcommittee on Commerce, Transportation, & Tourism (Mar. 7, 1985) ("Socolar").

Even beyond its flawed historical basis and impractical approach, *DuPont*'s central holding passed into law via a troubling route.  The notion of a statutory preference for administrative oversight does not appear in the district court's opinion.  *See E.I. Du Pont De Nemours & Co. v. United States*, 297 F. Supp. 2d 740 (D. N.J. 2003).  Neither party mentions the theory in its briefs, and the theory was not discussed at oral argument, except for a single question, which was misunderstood by the plaintiff-appellant's counsel (understandably, perhaps, given the theory's novelty).[15]  Nor had the theory been widely discussed in other cases, in academia or in the business community.  In fact, the opinion cites only a single source for affirmative support of the theory, a law review article written by the prevailing counsel in the *Aviall* case.  *DuPont*, 460 F.3d at 541 (citing W. Bradford Reynolds & Lisa K. Hsiao, *The Right of Contribution Under CERCLA After Cooper Industries v. Aviall Services*, 18 TUL. ENVTL. L. J. 339 (2005)).  In seven paragraphs at the end of the article, the authors assert their theory of

---

[15]  The entire exchange:

> The Court: Shouldn't you be asking Congress to do what you're asking? Because it looks to at least me as if the SARA amendments are now preferring, if there be a contaminated site, that there be oversight in cleaning it up and not so much done voluntarily unless there's oversight, be it some type of settlement, so that you have the EPA involved.  You're in a tough position.  Your position actually is plausible and could be quite valid, but it seems like we're the wrong group to address it to.

> Plaintiff-Appellant's Counsel: I would argue, your Honor, that Congress specifically provided for this cause of action in the original CERCLA statute and it's plain on its face.

> The Court: And is it your position that Cooper undermined, so undermined New Castle and Reading that we can proceed?

> Trans. Oral Arg. at 5.  Neither the panel nor counsel returned to the settlement theory for the rest of the argument.

administrative oversight and cite only a 1983 EPA report as any external support.[16]  Reynolds &

Hsiao, *supra*, at 352.  The *DuPont* opinion remains an outlier; no other court has adopted similar

reasoning, or a similar interpretation of the legislative history, or cited the Reynolds and Hsiao

article on this point.  *Cf. Glidden Co. v. FV Steel & Wire Co*., LEXIS 70242 (E.D. Wisc.

September 21, 2006) at 10 (rejecting *DuPont's* reasoning).

There is no basis to conclude that when it enacted SARA, Congress intended for there to

be EPA supervision over all cleanups.  The historical context in which SARA was drafted

suggests it would have been a wholly implausible approach.  On the contrary, it is clear from the

text of CERCLA requiring compliance with the NCP, and the text of the NCP requiring high-

quality cleanups, that Congress and EPA expect and encourage independent, voluntary, private

party cleanups.  Prohibiting PRP section 107(a) claims on the theory that all cleanups must be

done under EPA oversight flies in the face of the statute's plain meaning, historical context and

logical intent.

With this background in mind, it strains reason to believe that through SARA, by

codifying the ability of a PRP to file ***derivative*** actions in contribution, Congress acted to cut

---

[16] The language from the EPA report does appear to criticize private party cleanups, but the
authors fail to place it in the proper context.  "EPA studies have shown that many of the
response actions undertaken by private parties outside the sanction of EPA consent
agreements have not been successful."  Amendment to National Oil and Hazardous
Substance Contingency Plan; 48 Fed. Reg. 40,658, 40,661 (Sept. 8, 1983).  The cited section
of the report, however, addresses the issue of categorizing sites.  EPA's point is that since it
cannot vouch for the quality of sites with which it has no involvement, and some private
party sites have been of low quality, it does not want to label them as "(V) Voluntary or
Negotiated Response," and prefers to leave them labeled "(D) Actions to be Determined."
This concern is not relevant to section 107(a) actions, however, because costs incurred which
are not necessary to a CERCLA-quality cleanup are not recoverable under section 107(a).

back on the right of PRPs to file an ***original*** action to recover their response costs under CERCLA; yet that is what the United States argues in its motion.

> **3.    There is no conflict between sections 107(a) and 113(f)(1); they work together to provide comprehensive relief and encourage remediation at all contaminated sites.**

The structure of CERCLA reinforces the right of PRPs to hold other parties liable under section 107(a).  Sections 107(a) and 113(f) work in concert to govern an initial action for the recovery of costs, and any subsequent litigation, counterclaim, or third-party practice after that initial lawsuit has been filed.  Section 107(a) provides an ***original*** cause of action that permits private persons to recover costs consistent with the NCP that have been spent to address releases of hazardous substances.  *See* 42 U.S.C. § 9607(a)(4)(B).  It establishes who is liable, and sets forth the standards by which costs must be incurred to make them recoverable under the statute.[17]  Section 113(f)(1), on the other hand, provides only a ***derivative*** contribution action "during or following" an aforementioned section 107(a) or section 106 civil action.  Because costs sought under section 113(f)(1) are derivative, it is presumed that the original action required compliance with the NCP; so actions for contribution made under section 113(f)(1) are not required to show NCP consistency.  Further, because the liability is derivative, there is no requirement that a section 113(f)(1) plaintiff actually expend response costs, as distinguished

--------

[17] Section 107(a) ensures that response costs incurred voluntarily by private party PRPs further the goals of the statute.  It requires private parties to prove that they have incurred "necessary" response costs that are "consistent with the NCP," which represents a higher standard than the government must show to recover its costs.  *Compare* 42 U.S.C. § 9607(a)(4)(A) with 42 U.S.C. § 9607(a)(4)(B) (stipulating that the government may recover "all" costs "not inconsistent" with the National Contingency Plan while a private party may recover only "necessary" costs "consistent" with the National Contingency Plan).

from a section 107(a) claim where costs must first be expended before the right to sue accrues. *See* 42 U.S.C. §§ 9607(a), 9613(f)(1).

An owner who discovers contamination on its property can – immediately if necessary – expend response costs with the assurance that it can recover those costs from any responsible party under section 107(a)(1)-(4), within the statute of limitations period set forth under section 113(g)(2) (applicable to "[a]n *initial* action for recovery of the costs referred to in section 107" (emphasis added)). 42 U.S.C. § 9613(g)(2). After that initial suit is filed, any party may maintain a separate section 113(f)(1) action against other PRPs named in the initial action, other PRPs that have not been named, or against the original Plaintiff. Any derivative contribution action must be filed within three years of judgment in the original action or after settlement of that action. *See* 42 U.S.C. § 9613(g)(3). Unlike the situation prior to *Aviall,* when it was assumed that section 113(f)(1) provided both an original and derivative cause of action, the Supreme Court has explained that sections 107(a)(4)(B) and 113(f)(1) are not parallel; they address plaintiffs in two completely different procedural circumstances. *See Aviall*, 543 U.S. at 163 ("The cost recovery remedy of § 107(a)(4)(B) and the contribution remedy of § 113(f)(1) are similar at a general level in that they both allow private parties to recoup costs from other private parties. But the two remedies are clearly distinct."); *Consol. Edison*, 423 F.3d at 99 ("Each of those sections, 107(a) and 113(f)(1), embodies a mechanism for cost recovery available to persons in different procedural circumstances.").

The government's assertion that interpreting section 107(a)(4)(B) in accordance with its plain language would create a conflict between that section and section 113(f), Motion at 18-20, simply ignores the distinct nature of these two remedies. The government suggests that PRPs would be permitted "to choose" between section 107(a) and section 113(f) causes of action, and

accordingly, "a PRP could readily circumvent the various limitations on an action under section

113(f) simply by pursuing an action under section 107(a), thereby rendering section 113(f)

effectively superfluous." *Id.* at 19. But that suggestion has no merit. PRPs do not have a choice

of remedies. If a person has itself expended response costs, it may bring a claim for those costs

under section 107(a), and must adhere to the limitations period and burden of proof associated

with that claim. If a person has not itself expended response costs, that person is limited to filing

a section 113(f) contribution claim, and must adhere to the limitations and burdens associated

with that claim.[18]

The government's argument to the contrary is underlain by a mistaken premise pervasive

to the government's position, namely that "any claim by a PRP is essentially a claim for

contribution, regardless of how it is pled." Motion at 21-23. That premise, no matter how often

---

[18] Thus the scenario described in the government's motion, where a PRP that is outside the section 113(f) three-year statute of limitations period would nonetheless be able to choose to file under section 107(a) and take advantage of its six-year limitations period, *see* Motion at 19, would never come about. If the PRP's only claim is a derivative claim, he or she would not have access to section 107 and section 113(f)'s three-year limitations period would apply. If the PRP itself incurred response costs, the six-year limitations period would apply to its claim for recovery of those costs under section 107. There would be no "choice" of limitations periods. The government's other scenario, where a PRP would be able to avoid the contribution protection provisions of section 113(f)(2) by filing under section 107, *id.*, is similarly nonsensical. First, contribution protection only applies to settlements with the United States or a State, and only covers "matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). *See, e.g., Akzo Coatings Inc. v. Aigner Corp.*, 30 F.3d 761, 766 n.7 (7th Cir. 1994) (permitting a non-settling PRP to assert a claim against a settling PRP "because the decree defines 'covered matters' only in terms of claims available to the United States and the State of Indiana, claims that [the non-settling PRP] might have based on its own work would seem by definition excluded"). No private party PRP would be able to bring a 107(a) action to recover the United States' costs – section 107(a) actions are limited to response costs incurred by the party bringing the claim. A private PRP's action regarding costs incurred by the United States would, by necessity, be a derivative action under section 113(f)(1), and contribution protection for other settling parties would apply. The PRP could not "choose" to ignore those protections.

parroted prior to the *Aviall* decision, is now clearly incorrect. Under the modern common law interpretation of contribution, the party seeking contribution may only bring a claim when (1) it is sued in an action seeking to hold it jointly and severally liable for a common liability; or (2) when it has discharged the common liability through a settlement. *See* Restatement (Second) Torts, §886A, comment b. A cause of action for contribution cannot exist until either a lawsuit has been filed or a settlement reached – which is exactly the scope of section 113(f)(1) *after Aviall*. Original actions brought by PRPs against other PRPs under section 107(a) are *not* contribution actions because they are not derivative – they are the original claims that *give rise to* joint and several liability.[19]

Finally, the government's assertion that reading section 107(a)(4)(B) according to its plain terms would undermine the incentive for parties to settle CERCLA actions is unfounded. The crux of the government's argument is contained in the following passage:

> Under this view, a PRP that has not been sued under section 106 or 107 would be better off not settling its liability with EPA or a State – and thereby frustrating the Congressional policy to promote early settlement – so that it could claim to be a "volunteer" and sue under the "substantially more generous provisions of § 107(a)."

---

[19] The government's suggestion that the imposition of joint and several liability under section 107(a)(4)(B) makes that section inappropriate for use by PRPs is also groundless. Motion at 22-23. There is nothing untoward about a person that incurred costs at a site seeking to recover all of those costs from other parties in an initial action under section 107(a)(4)(B). The defendants in such an action are free to then assert contribution claims under section 113(f)(1) against the original plaintiff, and the court would be in a position to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). The fact that these contribution claims may be brought "*during* or following" a civil action under section 107(a) avoids the threat of multiple pieces of litigation concerning the same site. And the hobgoblin of orphan-share liability being inappropriately shifted by section 107(a)(4)(B) joint and several liability, Motion at 22-23, likewise dissipates in the face of section 113(f)(1)'s mandate that courts equitably apportion liability.

Motion at 31 (quoting *Bedford Affiliates v. Sills*, 156 F.3d 416, 424 (2d Cir. 1998)).[20]  In other words, the United States would have this Court prohibit PRPs from filing claims under 107(a), because otherwise those PRPs will *voluntarily clean up their waste sites*.  What the United States carefully omits, and implicitly denigrates with the quotation marks around "volunteer," is that in order to qualify for a section 107(a) claim, a PRP must first incur necessary costs – and not just any costs, but cleanup costs that comply with the NCP regulations.  Incredibly, in direct contravention of the purposes of CERCLA, the United States appears to view this a bad thing.  When the actual purpose of CERCLA – to clean up sites and allocate costs – is considered, PRPs voluntarily cleaning up their sites is a vision of success, not a "threat" that this court should seek by tortured statutory interpretation to avoid.

III.    **ELIMINATING CONTRIBUTION ACTIONS FOR VOLUNTARY CLEANUPS WOULD CREATE A CONFLICT OF INTEREST FOR THE UNITED STATES THAT MAY LEAD TO SIGNIFICANT REDUCTIONS IN CERCLA CLEANUPS.**

In *Atlantic Research Corp.*, the Eighth Circuit observed that eliminating PRP section 107(a) actions would permit the government to "insulate itself from responsibility for its own pollution by simply declining to bring a CERCLA cleanup action or refusing a liable party's offer to settle."  459 F.3d at 837.  To put that conflict of interest in perspective, the United States estimated its environmental liability at $259.8 billion at the end of fiscal year 2005.  *See* U.S. Dept. of Treasury, *Financial Report of the United States Government* at 40 (2005), *available at* https://www.fms.treas.gov.proxy.cheri.shyou.org/fr/05frusg/05frusg.pdf.  And, at the end of

---

[20] Once again, when discussing the incentives associated with settlement, the government wrongly asserts that contribution protection would be circumvented by allowing PRPs to sue under section 107(a)(4)(B).  Motion at 31-32.  As noted in footnote 13, *supra*, the government has wholly misconstrued the breadth of section 113(f)(2)'s contribution protection provisions.

fiscal year 2002, 158 of the 1,233 sites included on CERCLA's National Priorities List were owned or operated by the United States. *See* U.S. Gen. Accounting Office, *Superfund Program: Current Status and Future Fiscal Challenges* (GAO-03-850) (July 2003). Any interpretation of the statute that creates a loophole by which the government could escape some portion of that liability seriously undermines CERCLA's purpose of cleaning up waste sites and fairly allocating the costs. Thus, the Eighth Circuit held that, "Congress resolved the question of the United States' liability 20 years ago. It did not create a loophole by which the Republic could escape its own CERCLA liability by perversely abandoning its CERCLA enforcement power." *Atlantic Research Corp.*, 459 F.3d at 837.

In response, the United States argues that this issue should not be considered at all, because to do so impermissibly expands the waiver of sovereign immunity. The government points out that any CERCLA claim against the government is only permitted by virtue of such a waiver in section 120(a)(1), which makes federal agencies subject to CERCLA in the same manner as private parties. And because such waivers are to be construed strictly in favor of the sovereign, the government reasons that "any concerns unique to litigation against the United States, as opposed to a private party, are not germane to the proper interpretation of either section 107(a) or 113(f)." Motion at 33. This argument essentially misses the point. Lockheed Martin and Unisys rely on the plain language of section 107(a) for its contribution right; they do not ask this Court to "enlarge a waiver beyond its plain terms." *Id*. at 32. It is in fact the government that has put forward an interpretation based on legislative history and policy considerations, and asks this court to enlarge section 113(f) to include a non-existent prohibition against PRP section

107(a) suits, and to unduly restrict the unambiguous and comprehensive waiver of sovereign immunity Congress included in section 120(a)(1).[21]

Seeking to demonstrate that the United States would not take advantage of any loophole, the government cites to examples of cases in which the United States has brought suit against PRPs when the United States was itself a PRP at the same site.  But all of these cases took place prior to *Aviall*, when private PRPs could file section 113(f) suits against the government without waiting for the government to first initiate enforcement action.  There was no incentive, pre-*Aviall*, for the government to abandon enforcement at sites where it was a PRP—the loophole it now seeks to take advantage of did not yet exist.  Of course, regardless of whether the United States has taken enforcement action post-*Aviall* at some sites where it is a PRP, the risk that the United States will undermine CERCLA's intent by refusing to initiate actions which would trigger their liability in selected cases is undeniable.  Similarly, the government's suggestion that a state settlement satisfies section 113(f) is not dispositive, because such settlements may not always be available and may not actually trigger section 113(f).[22]

---

[21]  The waiver of sovereign immunity in CERCLA section 120(a)(1) is particularly clear and particularly broad:

> Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this Act in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 107 of this Act.

42 U.S.C. § 9620(a)(1).

[22]  In fact, the use of state settlements as a basis for section 113(f)(3)(B) claims is under considerable attack.  Beginning with *W.R. Grace v. Zotos Int'l*, No. 98-CV-838S(F) (W.D.N.Y. 2005), a series of courts have held that only the federal government can resolve a PRP's CERCLA liability for the purposes of section 113(f)(3)(B).  *See, e.g., ITT Indus., Inc.*

[Footnote continued on next page]

31

IV.    **IF NECESSARY, AN IMPLIED RIGHT OF CONTRIBUTION IN
SECTION 107(a) SURVIVED PASSAGE OF SARA AND SHOULD
BE INFERRED FROM THE PLAIN LANGUAGE OF CERCLA.**

To the extent that this Court finds that the right of PRPs to pursue cost recovery actions is not expressly granted in section 107(a), or that it finds that any action between PRPs must be termed a "contribution action," such a contribution action can be implied from the language of section 107(a).  The Supreme Court in *Aviall* declined to address whether an implied right to contribution exists, 543 U.S. at 170, but it did offer guidance on how to analyze that issue, citing its previous decisions in *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) and *Northwest Airlines, Inc. v Transp. Workers Union*, 451 U.S. 77 (1981).

The primary question in deciding whether a private right of contribution can be implied is "whether Congress intended to create the private remedy." *Northwest Airlines*, 451 U.S. at 94 (holding that Congressional intent is the "essential predicate" of the implication of a private right of contribution).  The relevant factors for assessing Congressional intent to create a right of contribution are "the language of the statute itself, its legislative history, [and] the underlying purpose and structure of the statutory scheme. . ." *Id*. at 91.

As argued throughout this brief, the language of Section 107(a)(4)(B) is plain:  any person may hold other PRPs liable for response costs.  Although the Supreme Court concluded in *Texas Instruments* and *Northwest Airlines* that no right of contribution arose under the federal antitrust laws or the Equal Pay Act, neither of those statutes contained a provision that creates a basis for such a right as clearly as CERCLA does in section 107(a)(4)(B).  It is likewise apparent

_____

[Footnote continued from previous page]
*v. Borgwarner, Inc.*, No. 1:05-CV-674 (W.D. Mich. 2006); *ASARCO, Inc. v. Union Pacific
R.R. Co.*, No. CV 04-2144-PHX-SRB (D. Ariz. 2006).  If this interpretation takes hold, and it
should not, the loophole identified by the Eighth Circuit will become significantly larger.

from the legislative history and the structure of CERCLA that Congress intended to promote

voluntary cleanups by PRPs, and nothing in the passage of SARA abrogated that right. Thus,

Congress intended to permit PRPs to sue other PRPs in original actions, as each of these factors

points to an intent to create a cause of action for PRPs under section 107(a)(4)(B).

The United States argues that it would be inappropriate to imply a cause of action for

contribution in section 107(a) because Congress expressly authorized a contribution right in

section 113(f)(1), and that recognition of an express contribution right dissolved any prior

implied right that may have existed. *See* Motion at 36-37. But the rights afforded by each

section are not coextensive: one addresses parties who have not been sued and have not settled

with the government, the other is a derivative action that applies after the initial lawsuit has been

filed. The government's view also conflicts directly with the Supreme Court's instruction that the

passage of Section 113(f)(1) cannot be used to "diminish" any rights that may flow from other

sources. Congress provided explicit instructions that preexisting "implied contribution" actions

survived passage of SARA in Section 113(f)(1)'s savings clause. The Supreme Court explained

that this clause "***rebuts any presumption*** that the express right of contribution provided by the

enabling clause [in Section 113(f)(1)] is the ***exclusive*** cause of action for contribution available

to a PRP." *Aviall*, 543 U.S. at 166-167 (emphasis added). Section 113(f)(1), therefore, "does

nothing to diminish any cause(s) of action for contribution that may exist independently of

§ 113(f)(1)." *Id*. at 166. Through the savings clause, Congress preserved the *status quo*, saving

any cause of action for implied contribution based upon Section 107(a)(4)(B) to the extent it

existed.

33

**V.      LOCKHEED MARTIN AND UNISYS HAVE PLED A VALID CAUSE OF ACTION UNDER THE DECLARATORY JUDGMENT ACT.**

As set forth above, Lockheed Martin and Unisys's complaint pleads a valid cause of action under CERCLA section 107(a).  That cause of action sufficiently establishes jurisdiction under the Declaratory Judgment Act.  *See* 28 U.S.C. § 2201 ("[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration.").  The waiver of sovereign immunity necessary to subject the United States to this cause of action is found in section 120(a) of CERCLA, 42 U.S.C. § 9620(a).

## VI.     THIS COURT SHOULD DENY THE UNITED STATES' MOTION TO DISMISS.

Lockheed Martin and Unisys respectfully request that this Court deny the United States' motion to dismiss.  The government cannot demonstrate that Lockheed Martin is a PRP; therefore, under its own theory of section 107(a), Lockheed Martin possesses a cause of action for cost recovery under CERCLA.  Moreover, regardless of the status of Lockheed Martin and Unisys, section 107(a) permits any private party, including PRPs, to seek recovery of necessary response costs spent in compliance with the NCP.  Accordingly, Lockheed Martin and Unisys have stated a valid claim upon which this Court can grant the relief requested.

Dated:  November 17, 2006                    Respectfully submitted,


                                             /s/ PETER E. SELEY
                                             Peter E. Seley, D.C. Bar Number 440936
                                             Michael K. Murphy, D.C. Bar Number 468907
                                             Gibson, Dunn & Crutcher, LLP
                                             1050 Connecticut Avenue, N.W.
                                             Washington, D.C.  20036
                                             (202) 955-8500
                                             pseley@gibsondunn.com

                                             *Counsel for Plaintiffs Lockheed Martin Corporation and Unisys Corporation*